UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


CIVIL ACTION NO. 13-10089-RWZ


WOMEN, ACTION & THE MEDIA CORP.

v.

WOMEN IN THE ARTS & MEDIA COALITION, INC.

<u>MEMORANDUM OF DECISION</u>

July 12, 2013


ZOBEL, D.J.

Plaintiff Women, Action & the Media Corp. has sued defendant Women in the Arts & Media Coalition, Inc., for trademark infringement and unfair competition. Plaintiff has registered the trademark WAM!, and uses a logo including those characters. It claims that its marks are infringed by defendant's use of the acronym WAM, and by defendant's logo (which features that acronym prominently). Plaintiff seeks a preliminary injunction barring defendant from further infringement. In response, defendant moves to dismiss the case for lack of personal jurisdiction, or to transfer it to the Southern District of New York.

**I.    Background**

**A. Plaintiff's Use of WAM!**

In 2004, a nonprofit women's advocacy organization called the Center for New Words ("the Center") hosted a conference for the advancement of women in the media. The full title of the conference was apparently "Women and the Media: Taking our

Place in the Public Conversation";[1] the conference brochure uses WAM! several times to refer to the conference. Docket # 7 (First Am. Compl.), Ex. A; see also id. ("WAM! registration includes entrance to all keynotes, workshops, and panels . . . ."). The brochure also occasionally uses the same acronym without an exclamation point. See id. (advertising "A Pre-WAM Breakfast With Amy Goodman").

The Center continued to host the same conference annually through 2009, and its promotional materials continued to use WAM! to refer to the conference (occasionally without the exclamation point). See Docket # 22 (Lu Decl.), Exs. B-G. Beginning in 2006, the conference used the name "Women, Action & the Media" (rather than "Women and the Media"). Compare id., Ex. C, with id., Ex. D.

In August 2009, the Center decided to dissolve. One of its members, Jaclyn Friedman, subsequently established plaintiff Women, Action & the Media Corp., a nonprofit corporation that "strives to create equal access, representation, employment, and ownership in the media for all, regardless of gender." Docket # 10 (Friedman Decl.) ¶¶ 1, 8. The Center thereupon transferred all of its assets, including any rights over the WAM! mark, to plaintiff.[2]

Plaintiff maintains its primary seat in Boston, with regional chapters in New York, Los Angeles, Ottawa, and Vancouver. It continues to host conferences under the WAM! mark; those conferences are "now sponsored regionally by the local chapters, under

---

[1] The conference brochure's cover is dominated by a large exclamation point. See Docket # 7 (First Am. Compl.), Ex. A. It is not clear whether this exclamation point was part of the official title of the conference.

[2] Defendant disputes the validity of this transfer and notes there appears to be no written record memorializing it.

the control and supervision of the central . . . office." Friedman Decl. ¶ 6. Plaintiff also

uses its WAM! mark in connection with its other activities which include networking,

education, and entertainment events that focus on issues relating to women and the

media. To communicate with its members (and potential members), plaintiff operates a

public website on which its WAM! mark is prominently displayed, and also an email

listserve.

### B. Defendant's Use of WAM

Defendant was founded in September 1989 as "The New York Coalition of

Professional Women in the Arts and Media"; it was subsequently incorporated in 1992

as the "New York Coalition of Professional Women in the Arts and Media, Inc.," Docket

# 21 (Second Lubin Decl.) ¶ 3. Since its founding, it often referred to itself as

"NYCWAM" or simply as "the Coalition." Id. ¶ 4. Defendant is structured as a coalition

of independent member organizations; its members include the Actors' Equity

Association, the Dramatists Guild, and the League of Professional Theatre Women,

among others. Defendant directs its activities towards the individual members of its

various member organizations. It seeks to coordinate the efforts of its member

organizations to "advance and support professional women in the performing arts and

media industries with resources like networking communities, information sharing, and

mentoring." Id. ¶ 5. Defendant remains headquartered in New York, although its

member organizations conduct events nationwide. See, e.g., Docket # 15 (First Lubin

Decl.) ¶ 22 (describing events in Miami, New York, Los Angeles, and Boston hosted by

one of defendant's member organizations); see also id., Ex. A (advertising those events

to all members of any of defendant's member organizations).

In September 2010, defendant shortened its name to "Women in the Arts & Media Coalition, Inc.," or simply "WAM Coalition." It also adopted a new logo prominently displaying the acronym WAM.

### C.    Events Leading to This Action

On April 25, 2012, defendant sent plaintiff an email inviting it to become one of defendant's associate member organizations. It offered a one-year associate membership for $150. Defendant reached out to plaintiff again by email on May 31, 2012; it once more invited plaintiff to join as an affiliated organization and also advertised an information session in New York.

On the same day, plaintiff filed a trademark application for the mark WAM! in "standard characters without claim to any particular font, style, size, or color." First Am. Compl., Ex. B. It asserted use of the mark with respect to various charitable services involving women's advocacy, including "women's economic development and health projects," "providing a website featuring information about political issues," and "public advocacy to promote awareness of gender inequality in the media." Id. Plaintiff claimed priority in the mark back to June 1, 2004.[3]

On June 5, 2012, plaintiff responded to defendant's invitations by asking them to rebrand under a different name. That email was followed by a formal cease and desist letter from plaintiff's counsel. Defendant, however, refused to rebrand. Six months later,

---

[3] The rationale behind the June 1, 2004, date is somewhat unclear, as the Center's first conference using the WAM! acronym opened on April 30, 2004. See First Am. Compl., Ex. A.

the U.S. Patent and Trademark Office registered plaintiff's WAM! mark; plaintiff filed this suit on the same day.

## II.     Personal Jurisdiction

Defendant moves to dismiss this action for lack of personal jurisdiction. To decide this motion, I apply the prima facie standard, which is "the most commonly used method of determining a motion to dismiss for want of personal jurisdiction." Boit v. Gar-Tec Prods., 967 F.2d 671, 675 (1st Cir. 1992). "Under the prima facie standard, the inquiry is whether the plaintiff has proffered evidence which, if credited, is sufficient to support findings of all facts essential to personal jurisdiction." Phillips v. Prairie Eye Ctr., 530 F.3d 22, 26 (1st Cir. 2008). I accept as true all the evidence proffered by plaintiff and also consider uncontested facts put forward by defendant. Mass. Sch. of Law at Andover v. Am. Bar Ass'n, 142 F.3d 26, 34 (1st Cir. 1998).

Personal jurisdiction must be authorized by state statute and must comply with the Due Process Clause of the federal Constitution. Adelson v. Hananel, 652 F.3d 75, 80 (1st Cir. 2011). The Massachusetts Supreme Judicial Court has interpreted the state's long-arm statute to grant personal jurisdiction to the full extent permitted by the Due Process Clause; therefore, I need only consider whether personal jurisdiction here satisfies due process. Id. at 80-81; Phillips, 530 F.3d at 26.

Personal jurisdiction can be either general or specific. For general jurisdiction, due process requires that the defendant have continuous and substantial contacts with the forum state, but the claim need not be related to those contacts.  Harlow v. Children's Hosp., 432 F.3d 50, 57 (1st Cir. 2005). For specific jurisdiction, the

defendant need only have some minimum contacts with the forum state; however, the claim must be related to those contacts. Id. Furthermore, the defendant's contacts must represent a purposeful availment of the privilege of conducting activity in the forum state, and the exercise of jurisdiction must be reasonable under the circumstances. Phillips, 530 F.3d at 27.

Plaintiff does not assert that defendant is subject to general jurisdiction in Massachusetts, only specific jurisdiction. It relies primarily on two contacts between defendant and Massachusetts. First, defendant specifically solicited business in Massachusetts by sending plaintiff two emails, offering it a one-year associate membership in defendant's organization for $150. Second, defendant used its public website (accessible in Massachusetts) to advertise an event taking place in Boston. That event was hosted by one of defendant's member organizations and open to all members of any member organization. Both defendant's solicitation emails and its online advertisement used the allegedly infringing logo and the name "WAM Coalition."

Those contacts are sufficient to support specific jurisdiction here. First, they show that defendant had some minimum contacts with Massachusetts, since it sent electronic communications into this state and solicited business here. See Adams v. Adams, 601 F.3d 1, 7 (1st Cir. 2010) (noting that a defendant who "has not been physically present in the forum state" may have contacts through "telephone or electronic communication"). Moreover, plaintiff's claims are specifically related to those contacts, since defendant used the name "WAM Coalition" and the logo at issue in its emails and on its website advertisement.

6

Second, the contacts also represent purposeful availment of the Massachusetts forum. The website advertisement specifically invites defendant's affiliates to an event in Boston indicating the advertisement was directed in part at a Massachusetts audience. Cf. BroadVoice, Inc. v. TP Innovations LLC, 733 F. Supp. 2d 219, 224-25 (D. Mass. 2010). As to the solicitation emails, it is clear from the April 25, 2012, email that defendant knew it was soliciting a Boston-based organization. See Second Lubin Decl., Ex. A ("[I]t seems you started in Boston."). The evidence presented shows a voluntary decision by defendant to reach into Massachusetts. And by using its name and logo on communications sent to Massachusetts, defendant made a trademark infringement suit over that name and logo foreseeable in Massachusetts. See Stratus Techs. Berm. v. EnStratus Networks, LLC., 795 F. Supp. 2d 166, 168 (D. Mass. 2011).

Finally, the exercise of jurisdiction is reasonable here in light of the five "gestalt factors." Adelson, 652 F.3d at 83. Those factors consider (1) the defendant's burden of appearing; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in convenient and effective relief; (4) the judicial system's interest in the most effective resolution of the controversy; and (5) the shared interest of all states in furthering basic social policies. N. Laminate Sales, Inc. v. Davis, 403 F.3d 14, 26 (1st Cir.2005). The burden on the defendant here is relatively low given the extensive communication and transportation network connecting Boston with defendant's headquarters in New York. As to the second factor, Massachusetts has a significant interest in protecting the trademarks of its corporations. See Berklee Coll. of Music v. Music Indus. Educators, 733 F. Supp. 2d 204, 210 (D. Mass. 2010). The third factor

also weighs in favor of finding jurisdiction since plaintiff is located here; so does the
fourth factor since proceedings have already commenced in this court and they can be
effectively resolved here. The fifth factor is neutral. Taken as a whole, then, the gestalt
factors indicate that specific jurisdiction over defendant is reasonable.

For these reasons, defendant is subject to specific personal jurisdiction. Its
motion to dismiss for lack of personal jurisdiction is denied.

### III.   Transfer

Alternatively, defendant requests that this case be transferred to the Southern
District of New York. A district court may transfer any civil action to another district "[f]or
the convenience of parties and witnesses" and "in the interest of justice." 28 U.S.C.
§ 1404(a). The burden of proof rests with the party seeking a transfer, and there is a
strong presumption in favor of the plaintiff's choice of forum. Astro-Med, Inc. v. Nihon
Kohden Am., 591 F.3d 1,12 (1st Cir. 2009). The court may consider a number of
additional factors including the law to be applied, the connection between the forum
and the issues, and the interests of the relevant states and the public. World Energy
Alts. v. Settlemyre Indus., 671 F. Supp. 2d 215, 218 (D. Mass. 2009).

Here, defendant's motion to transfer rests solely on the proposition that it faces a
higher burden in traveling to Boston than plaintiff faces in traveling to New York. That
argument is not persuasive. Because defendant has failed to overcome the strong
presumption in favor of plaintiff's chosen forum, the motion to transfer venue is denied.

### IV.   Preliminary Injunction

Plaintiff moves for a preliminary injunction barring defendant from further

trademark infringement. Such an injunction is "an extraordinary and drastic remedy that is never awarded as of right." Peoples Fed. Sav. Bank v. People's United Bank, 672 F.3d 1, 8-9 (1st Cir. 2012) (quoting Voice of the Arab World, Inc. v. MDTV Medical News Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011)). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Natural Res. Def. Council, 555 U.S. 7, 20 (2008). The likelihood of success on the merits is generally the most important inquiry, particularly in trademark cases. Peoples Fed. Sav. Bank, 672 F.3d at 9.

### A.    Likelihood of Success on the Merits

To succeed on its trademark infringement claim, plaintiff must demonstrate (1) that it owns a mark meriting protection; and (2) that there is a likelihood of confusion between defendant's mark and its own. Peoples Fed. Sav. Bank, 672 F.3d at 9.

### 1.    Ownership

To show that it owns the WAM! mark, plaintiff has submitted its registration of that mark. Registration is "prima facie evidence of the validity of the registered mark and . . . of the registrant's ownership of the mark." 15 U.S.C. § 1115(a). Defendant counters by asserting several defects in plaintiff's claim of ownership. First, defendant claims there is no evidence that the Center properly assigned the WAM! mark to plaintiff along with its accompanying goodwill. Cf. Boathouse Grp. v. Tigerlogic Corp., 777 F. Supp. 2d 243, 250 (D. Mass. 2011) ("To be valid, an assignment of a trademark

must include an assignment of the goodwill associated with the mark . . . ."). But plaintiff

has submitted a declaration stating that the Center transferred to plaintiff all of its

"financial resources and personal and intellectual property"—presumably including any

goodwill associated with its trademark. See Friedman Decl. ¶ 5. And given plaintiff's

registration, the burden is on defendant to produce evidence rebutting the validity of

the asserted transfer. Defendant has produced no such evidence.

Second, defendant argues that the Center itself never held any rights in the

WAM! mark. But the materials submitted clearly show that the Center consistently used

WAM! to refer to its conferences from 2004 on, even if that was not the sole or even the

primary name by which those conferences were known. This evidence supports the

conclusion that plaintiff's mark has been used in commerce since 2004, as stated in the

registration. Moreover, even if the Center had not owned the mark and validly assigned

it to plaintiff, the evidence indicates that plaintiff has been using the mark WAM! since it

was founded in late 2009. It can therefore assert its own independent use of the mark

to support its trademark rights.

Defendant next argues that plaintiff's rights are limited to the use of WAM! in

connection with the original WAM! conferences. That argument fails. "Trademark

protection may extend beyond the exact product to include related products or

services." Boathouse Grp., 777 F. Supp. 2d at 250 (citing Bos. Athletic Ass'n v.

Sullivan, 867 F.2d 22, 28 (1st Cir. 1989)). Here, plaintiff's registration provides prima

facie evidence that plaintiff is entitled to control use of the WAM! mark on a variety of

services related to the original conference; and defendant has not persuasively

rebutted that evidence.

Finally, defendant argues that because the original WAM! conferences ended in 2009, the WAM! mark has been abandoned. But plaintiff has used the WAM! mark extensively since it was founded, both in connection with conferences hosted by its subsidiary chapters and in connection with its other activities; it certainly has not refrained from using the mark for three consecutive years, nor has it discontinued use of the mark with intent not to resume such use. See 15 U.S.C. § 1127. There is no abandonment here.

In sum, plaintiff has adequately demonstrated that it owns use of the WAM! mark in connection with the services that it provides.

### 2. Likelihood of Confusion

Eight factors guide the inquiry into likelihood of confusion: (1) the similarity of the marks; (2) the similarity of the services provided; (3) the relationship between the parties' channels of trade; (4) the relationship between the parties' advertising; (5) the classes of prospective consumers; (6) evidence of actual confusion; (7) the defendant's intent in adopting its mark; and (8) the strength of the plaintiff's mark. Peoples Fed. Sav. Bank, 672 F.3d at 10 (quoting Pignons S.A. de Mecanique de Precision v. Polaroid Corp., 657 F.2d 482, 487 (1st Cir. 1981)). "A proper analysis takes cognizance of all eight factors but assigns no single factor dispositive weight." Borinquen Biscuit Corp. v. M.V. Trading Corp., 443 F.3d 112, 120 (1st Cir. 2006).

### a.    Similarity of the Parties' Marks

To evaluate the similarity of the parties' marks, I consider their "sound,

appearance, and meaning." <u>Volkswagenwerk Aktiensgesellschaft v. Wheeler</u>, 814 F.2d
812, 817 (1st Cir. 1987).

Plaintiff has registered WAM! as its mark, using "standard characters without
claim to any particular font, style, size, or color." First Am. Compl., Ex. B. Plaintiff claims
it has used the WAM! mark ever since. Its logo is a stylized version of the mark in
which the characters appear as block letters in burnt umber, outlined in orange and
yellow. In that version, the A is aligned slightly lower than the other letters, while the
exclamation point is aligned slightly higher; the A and exclamation point also overlap
the W and the M. This logo is often accompanied by the phrase "Women, Action & the
Media" in burnt umber. <u>See</u> Friedman Decl., Ex. A; "Women, Action & the Media,"
<u>Facebook</u>, https://www.facebook.com/WomenActionMedia (last visited June 26, 2013).

Defendant normally refers to itself by the name WAM Coalition, though it has
also used the acronym WAM alone.[4] Its logo displays the acronym WAM in large font,
using the color cranberry for the W, royal purple for the A, and magenta for the M. The
W is partly covered by the A, which in turn is partly covered by the M. The white space
across the three letters in the logo forms the silhouettes of four women performing by
dance, song, and photography. The words "Women in the Arts & Media Coalition, Inc."
also usually run in smaller font across the bottom of the logo. <u>See</u> Docket # 11 (Rufo
Decl.), Ex. I; <u>see also</u> "WAM: Women in the Arts and Media Coalition," <u>Facebook</u>,

---

[4] Although defendant has submitted a declaration stating that it has never referred to itself by the
acronym WAM alone, <u>see</u> Second Lubin Decl. ¶ 9, that statement is demonstrably false. <u>See, e.g.</u>,
"About", <u>Women in the Arts & Media Coalition, Inc.</u>, http://www.wamcoalition.org/About .html (last visited
June 26, 2013) ("As a resource for professional development and social exchange, WAM is without
equal.").

https://www.facebook.com/WAMcoalition (last visited June 26, 2013) (replacing "Women in the Arts and Media Coalition, Inc." with "Coalition" in one image, and omitting it entirely in another image).

Both plaintiff's WAM! and defendant's WAM are apparently pronounced "wham"—that is, they sound the same. Even if defendant always used "WAM Coalition" and never WAM alone, the aural similarity would persist, since even listeners hearing the whole phrase will focus more on the identifying acronym "WAM" rather than the generic term "Coalition." See Coach Servs. v. Triumph Learning LLC, 668 F.3d 1356, 1368 (Fed. Cir. 2012) (marks must be viewed in their entirety, but it is appropriate to give more weight to a mark's dominant feature in determining its commercial impression).

As to the visual appearance of the words, WAM! and WAM closely resemble each other when used in plain text. Plaintiff's exclamation point does not make a substantial visual difference. And again, even if defendant consistently used "WAM Coalition," the visual similarity would remain because the average viewer is likely to focus more on the distinctive acronym than the common noun.

The visual appearance of plaintiff's and defendant's logos shows greater difference. While plaintiff uses the same burnt umber for all three letters, defendant uses a different color for each letter. The fonts of each logo differ noticeably, and defendant's logo is particularly distinguished by the female silhouettes appearing within and around the letters. Plaintiff's exclamation point also has greater impact in its logo, where it appears above the other characters and set off at an angle. Finally, when the

13

logos appear with the full names of their respective organizations, those full names naturally help to differentiate the marks. Cf. Pignons, 657 F.2d at 487 ("[I]n certain circumstances otherwise similar marks are not likely to be confused where used in conjunction with the clearly displayed name . . . of the manufacturer.") But as the full names in both logos appear in a subordinate position and a much smaller size, they will not definitively prevent confusion—especially since the full names themselves are similar.

Despite the differences between the logos, both are dominated by the same letters WAM. That acronym is the primary impression conveyed to any viewer observing either one. Both logos also generally use a warm color palette, dominated by red hues. While the visual appearance of each logo differs, the total effect remains sufficiently similar to raise the potential for confusion.

Finally, the meaning of the two marks does not distinguish them. Neither "WAM!" nor "WAM" (nor even "WAM Coalition") has any immediately obvious meaning to the casual observer. This is not a case where the parties' acronyms are so well known that the relevant consumer could distinguish them by the words they represent. Cf. McCarthy on Trademarks and Unfair Competition § 23:33 (4th ed. West 2013) [hereinafter McCarthy]. Although plaintiff's exclamation point adds some connotation of violent impact, while defendant's "Coalition" adds a sense of structure and organization, these shades of meaning do not significantly distinguish the parties' marks.

For the reasons above, I find that the parties' word marks (plaintiff's "WAM!" and

14

defendant's "WAM" or "WAM Coalition") are substantially similar. I also find that the parties' logos, while less similar than their word marks, still produce a fairly similar commercial impression. As such, this factor weighs in favor of finding a likelihood of confusion.

### b.     Similarity of the Parties' Services

As described above, plaintiff's mission is to increase the role of women in the media. It pursues that goal by hosting networking and educational events, holding conferences through its regional chapters, and maintaining a website and listserve. Defendant is similarly dedicated to the advancement of women in the arts and media industries; it likewise pursues that goal through advocacy and networking events, and also maintains an informational website.

There are slight differences between the approach that the parties take towards their shared goal. Plaintiff directly accepts individuals as members, while defendant accepts only member organizations (and then provides services for those organizations' individual members). Plaintiff apparently arranges its own events more frequently, while defendant primarily coordinates the activities of its member organizations. Finally, plaintiff apparently has a broader awareness-based approach, while defendant tends to focus on providing resources and support for individual professional women pursuing careers in media or the arts.

But these differences do not substantially distinguish the services that the parties provide. Both plaintiff and defendant use advocacy and networking to promote women to greater prominence in the public media. As the parties perform similar

functions in the same sphere, this factor weighs strongly in favor of finding a likelihood
of confusion.

### c.      Channels of Trade

The parties do have somewhat differing channels of trade. As discussed above,
plaintiff directs its efforts at recruiting individual members, while defendant focuses on
recruiting new member organizations and then directs its activities at members of those
organizations. That difference in the parties' recruitment mechanisms somewhat
decreases the likelihood of confusion. But the line between recruiting individuals and
recruiting organizations is hardly precise; plaintiff has collaborated with other affiliated
organizations in the past, and defendant obviously corresponds with particular
individuals in order to reach their organizations. So while this factor weighs against a
likelihood of confusion, it does not weigh heavily.

### d.      Advertising

The parties agree that both advertise their services online through their
respective websites. Plaintiff notes that a Google search for "WAM" or "WAM!" returns
both plaintiff's and defendant's website on the first page. Defendant argues that the
parties' websites are sufficiently different that a consumer will quickly realize she is at
the wrong site; but given the similarities in the parties' marks and services, I am not
persuaded. I conclude the parties' similar advertising channels weigh in favor of finding
a likelihood of confusion.

### e.      Prospective Consumers

Plaintiff's class of prospective consumers includes anyone interested in

16

promoting the role of women in the media. Defendant's class of prospective consumers is somewhat more limited; it focuses primarily on serving the members of its member organizations. But those member organizations are themselves devoted to arts and the media, and so they overlap substantially with plaintiff's target audience. Indeed, one of plaintiff's board members is also involved in one of defendant's member organizations. Because both parties have such similar missions, they are likely to attract the same prospective consumers to participate in their activities and events. This factor consequently weighs in favor of finding a likelihood of confusion.

### f.      Evidence of Actual Confusion

As evidence of actual confusion, plaintiff has submitted an email from the outreach coordinator of the Athena Film Festival, an annual film festival focused on women and leadership. That email was sent to plaintiff's executive director, but asked "whether Women in the Arts and Media Coalition [i.e., defendant] would be interested in partnering with the festival." Friedman Decl., Ex. F. Plaintiff answered expressing interest but pointing out the mistaken name. The film festival's outreach coordinator responded in turn, writing: "Oh my gosh, I am so sorry about the confusion! I did in fact mean to contact you (Women, Action & the Media) but I got the groups mixed up when I wrote the email as we are in fact also working with the other WAM!" Id. Finally, in a later email in the same chain, the outreach coordinator asks if "to avoid confusion," she could "spell out Women, Action & the Media" in the film festival program (rather than simply using the acronym WAM!). Id.

Defendant argues that this email chain shows only carelessness and inattention,

17

not confusion caused by the parties' similar marks. Cf. McCarthy § 23:13 (confusion caused by mere carelessness, rather than by the use of similar marks, does not weigh in the infringement inquiry). It takes the position that the film festival intended to reach plaintiff all along, but the outreach coordinator just typed the wrong name in the first email. On that premise, defendant argues that the festival's slip of the tongue (or rather keyboard) does not show actual confusion; in other words, it does not indicate that the festival ever mistakenly attributed plaintiff's services to defendant or vice versa.[5]

The email chain submitted can plausibly be construed to evince either actual confusion or mere carelessness. At best, it shows that one third party may have been misled by the parties' similar marks. The evidence is not strong enough to tip this factor in plaintiff's favor; nor is it weak enough to tip this factor in defendant's favor, given that the parties' marks have only been competing for a relatively short time. See Borinquen, 443 F.3d at 121. This sixth factor remains neutral.

### g.    Defendant's Intent

Defendant has submitted an affidavit stating that when it adopted its new mark, it was not aware of plaintiff's mark (or even plaintiff's existence). Plaintiff has not produced any evidence to rebut that contention. Because there is no evidence that defendant selected its mark in bad faith, this factor weighs against finding a likelihood of confusion. See Bos. Duck Tours, LP v. Super Duck Tours, LLC, 531 F.3d 1, 25-26 (1st Cir. 2008).

---

[5] Defendant also notes that one of the co-founders of the Athena Film Festival, who instructed the outreach coordinator to contact plaintiff, is on plaintiff's advisory board—making it particularly unlikely that the festival would actually confuse the two groups.

18

### h. Strength of the Mark

The final factor considers the strength of plaintiff's mark. The mark's conceptual strength depends on its distinctiveness, which indicates its "capacity to serve . . . a source-identifying function." Bos. Duck Tours, 531 F.3d at 12. "In assessing a mark's distinctiveness, proposed marks are categorized along a spectrum as '(1) generic (least distinctive), (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful (most distinctive).'" Peoples Fed. Sav. Bank, 672 F.3d at 5 n.6 (quoting Bos. Duck Tours, 531 F.3d at 12). Here, plaintiff's word mark WAM! and its logo are each an arbitrary mark for the services plaintiff provides. Although the letters represent the descriptive phrase "Women, Action & the Media," the abbreviation seen by itself "will not be recognized as merely a shortened form of the original descriptive word[s]." McCarthy § 11:32; see also id. § 12:37. Because WAM! is an arbitrary mark, it is inherently distinctive and so conceptually strong. See Peoples Fed. Sav. Bank, 672 F.3d n.6.

Defendant argues that because the acronym WAM is used by many different entities, plaintiff's mark is "merely one of a crowd of similar marks." McCarthy § 11:85. But the crowded-field doctrine only applies where the mark at issue is "hemmed in on all sides by similar marks on similar goods or services." Id. (emphasis added). Here, while defendant has cited a number of organizations using the acronym WAM, those organizations generally do not focus on advocating a greater role for women in the media. For instance, there are apparently two other organizations that have registered the word mark WAM! (identical to plaintiff's). The first organization provides "entertainment services in th[e] nature of cable and satellite television programming."

19

Lu Decl., Ex. N. The second provides "live musical performances"; "instruction in the field of religion, music, and art"; and publication of sheet music, musical records, and materials on the topic of religion. Lu Decl., Ex. O. Obviously, neither of these organizations produces goods or services that are substantially similar to plaintiff's.

Defendant does point to two organizations with a mission somewhat similar to plaintiff's. One is the Women's Audio Mission (which also uses the acronym WAM), dedicated to the advancement of women in music production and recording. The other is Women And Minorities in Media (which uses the acronym WAMM); that organization's primary activity is an annual conference for the advancement of women and minorities in media production. While these two organizations provide services that are more closely related to plaintiff's (and defendant's), their existence and their similar marks simply do not make the field so crowded that consumers will "have learned to carefully pick out one from the other." McCarthy § 11:85; cf. Peoples Fed. Sav. Bank, 672 F.3d at 16 (noting that the district court found the word "Peoples" in a bank's name descriptive "in part because it was frequently used in the banking industry as a whole").

At the same time, plaintiff has not submitted much evidence to show that its mark and logo have commercial strength. See Bos. Duck Tours, 531 F.3d at 16 (court should analyze both conceptual and commercial strength of plaintiff's mark). Commercial strength looks to factors including "the length of time a mark has been used and the relative renown in its field; the strength of the mark in plaintiff's field of business; and plaintiff's action in promoting the mark." Id. at 16 n.14 (quoting Equine Techs. v. Equitechnology, Inc., 68 F.3d 542, 547 (1st Cir. 1995). In these areas, plaintiff's case is

20

somewhat weaker. While plaintiff and its predecessor have used the WAM! mark since 2004, the evidence does not state precisely how long plaintiff has used its current logo. And the record reveals little about the relative renown of plaintiff's mark and logo in their field, or plaintiff's action to promote them.

Considering both the conceptual and the commercial strength of plaintiff's mark and logo, this factor weighs only moderately in favor of finding a likelihood of confusion.

### i.    Summary

Examining all eight factors together, I find that plaintiff has made a relatively strong showing that confusion is likely. The similarity between the parties' marks, and to a lesser extent between their logos, weighs in favor of a likelihood of confusion. When that factor is combined with the similarity between the parties' services, the weight only increases. The overlap in prospective consumers, the shared use of online advertising, and the moderate strength of plaintiff's mark also tend towards the same conclusion; and the other opposing or neutral factors are not sufficient to overcome it.

### 3.    Conclusion

Because plaintiff owns its WAM! mark and logo, and because defendant's similar mark and logo will likely cause confusion, plaintiff has demonstrated a likelihood of success on the merits.

### B.    Irreparable Harm

In the past, irreparable harm was presumed as a matter of law whenever a plaintiff in a trademark infringement action showed a likelihood of success on the merits. See, e.g., Am. Bd. of Psychiatry & Neurology v. Johnson-Powell, 129 F.3d 1, 3-

4 (1st Cir. 1997). It is unclear whether that presumption remains good law. Peoples

Fed. Sav. Bank, 672 F.3d at 9 n.11. In any case, even without the presumption, plaintiff

has made a sufficient showing here that irreparable harm is likely. One of the primary

injuries caused by trademark infringement is that the trademark holder may lose control

over its own commercial reputation. See Beacon Mut. Ins. Co. v. OneBeacon Ins. Grp.,

376 F.3d 8, 15 (1st Cir. 2004); see also McCarthy § 24:15. That loss of control is a

separate and distinct injury that exists even if defendant's services are superior. See

McCarthy § 24:15 ("To deny relief upon the ground that defendant's goods are not

inferior today is to place plaintiff's business reputation in the hands of a stranger over

whom he has no control."). Moreover, that harm is irreparable; money damages cannot

adequately compensate for it, since such damages would be "very difficult to quantify at

trial." McCarthy § 30:46.

Plaintiff has provided specific evidence that it is currently losing control of its

own mark because of defendant's similar branding. See, e.g., Friedman Decl., Ex. F

("Would it be ok to spell out Women, Action & the Media to avoid confusion?") Absent

an injunction, that loss of control will continue. Plaintiff has thus adequately

demonstrated a likelihood of irreparable harm if defendant is not enjoined.

Defendant seeks to rebut this conclusion by arguing that plaintiff delayed

unreasonably before moving for a preliminary injunction. An unreasonable delay

between when a plaintiff learns of the infringement and when it files suit can undermine

a showing of irreparable harm. See Jagex Ltd. v. Impulse Software, 750 F. Supp. 2d

228, 239 (D. Mass. 2010) (citing Fritz v. Arthur D. Little, Inc., 944 F. Supp. 95, 99 (D.

Mass. 1996)). In this case, plaintiff waited nine months after learning of defendant's

mark before filing suit, and two more months before moving for a preliminary injunction.

I do not find that delay unreasonable under the circumstances, especially given that the

parties spent several months attempting to negotiate an amicable solution before

plaintiff filed suit. Cf. Jagex, 750 F. Supp. 2d at 239 (finding plaintiff's delay

unreasonable where it waited two years before filing suit and another five months

before seeking an injunction). The delay therefore does not significantly impair

plaintiff's showing of irreparable harm.

C.    **Balance of Equities**

In balancing the equities, the court considers the hardship each side will suffer

from an adverse decision. See Borinquen, 443 F.3d at 115. If a preliminary injunction is

denied, plaintiff and defendant will continue to use their similar marks; plaintiff will then

suffer the ongoing loss of control over its reputation and the potential loss of future

consumers for its services. If a preliminary injunction is entered, on the other hand,

defendant will lose the investment that it has put into its rebranding efforts since

September 2010. Both harms are significant, but on balance, I find the harm to plaintiff

weighs more heavily here, since to a certain extent defendant brought its harm upon

itself by failing to learn of plaintiff's existence before launching its rebranding. See

McCarthy § 30:51; cf. R&G Mortg. Corp. v. Fed. Home Loan Mortg. Corp., 584 F.3d 1, 9

(1st Cir. 2009) (in the context of a motion to intervene, "a preventable hardship weighs

less heavily in the balance of harms").

### D.     Public Interest

The public has a substantial interest in protecting against competing marks that confuse consumers. <u>See</u> <u>Volkswagenwerk</u>, 814 F.2d at 820. Given the likelihood of confusion here, and the lack of any opposing public interest, this factor weighs in favor of a preliminary injunction.

### E.     Summary

As all four parts of the traditional test weigh in favor of a preliminary injunction, plaintiff has carried its burden to show that relief is warranted.

## V.     Conclusion

Defendant's motion to dismiss for lack of personal jurisdiction or to transfer the case (Docket # 13) is DENIED. Plaintiff's motion for a preliminary injunction (Docket # 8) is ALLOWED. The parties shall submit a proposed preliminary injunction.

Plaintiff's motion for leave to file a reply brief (Docket # 24) is ALLOWED.


_____July 12, 2013_____                    _____/s/Rya W. Zobel_____

          DATE                                             RYA W. ZOBEL
                                               UNITED STATES DISTRICT JUDGE